IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

CHRISTOPHER CHAFIN,

                  Plaintiff,

v.                                                   CIVIL ACTION NO.   2:24-cv-00135

STEVE CAUDILL, et al.,

                  Defendants.

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendants Steve Caudill, Jason Hutson, and Joseph Wood's ("Defendants") Motion to Dismiss Plaintiff's Amended Complaint. (ECF No. 85.) For the reasons discussed below, Defendants' motion is **DENIED IN PART** and **GRANTED IN PART**.

### I.    BACKGROUND

Plaintiff Christopher Chafin ("Plaintiff") initiated this action on March 19, 2024. (ECF No. 1.) Plaintiff's Complaint was amended on December 19, 2024. (ECF No. 78.) This action arises from Plaintiff's allegations of Defendants' deliberate indifference to a substantial risk of serious harm that Plaintiff was exposed to at the North Central Regional Jail and Correctional Facility ("NCRJ"). (*Id.* at 1.) Plaintiff's complaint was submitted pursuant to 42 U.S.C. § 1983 for violations of his rights under the Fourteenth Amendment of the United States Constitution. (*Id.*) Plaintiff was at all relevant times a pre-trial detainee incarcerated at NCRJ. (*Id.*)

Relevant to the present motion are Counts V and VI of the Amended Complaint. (*Id.* at ¶¶ 153-69.) In Count V, Plaintiff alleges Defendants Hutson, Wood, and Caudill violated Plaintiff's Fourteenth Amendment rights when they were "deliberately indifferent to the serious risk of substantial harm to [Plaintiff's] health and safety posed by the well-known and long-tolerated pattern and practice of correctional officers at NCRJ using excessive force on inmates, including pepper spraying, beating and otherwise using physical violence against inmates like [Plaintiff], for no legitimate, nonpunitive purpose." (*Id.* at ¶ 154.) In Count VI, Plaintiff alleges that Defendants Hutson[1] and Wood "knew of or should have known of the substantial risk of serious harm to [Plaintiff] posed by failing to restrict access to razors to inmates prone to self-harm." (*Id.* at ¶ 160.) Defendant Wood was the Superintendent of NCRJ in February and early March 2023, at which time Defendant Hutson became the Superintendent. (ECF No. 78 at ¶¶ 5-6.) Defendant Caudill was at all times relevant to Plaintiff's Complaint the Director of Security Services at the West Virginia Division of Corrections and Rehabilitation ("WVDCR"). (*Id.* at ¶ 4.)

As alleged in the Amended Complaint, Plaintiff suffers from major depression, post-traumatic stress disorder, schizoaffective disorder, borderline personality disorder, antisocial personality disorder, frequent suicidal ideation, and substance use disorder. (ECF No. 78 at ¶ 15.) Plaintiff requires psychiatric medications to quell hallucinations and suicidal ideation. (*Id.*) Plaintiff previously attempted suicide in other WVDCR facilities prior to his incarceration at NCRJ in 2023. (*Id.* at ¶ 16.)

---

[1] References to "Hutson" only apply to Defendant Jason Hutson, as the parties stipulated to the voluntary dismissal of this civil action with prejudice as to Valerie Hutson. (ECF No. 136.)

Plaintiff arrived at NCRJ on February 2, 2023. (*Id.* at ¶ 19.) As alleged, shortly after arriving, Correctional Officer ("CO") Daniel Brill ("Brill") sprayed Plaintiff in the face with oleoresin capsicum spray ("OC") without first issuing an order or directive. (*Id.* at ¶ 20.) Plaintiff was not violating an order or posing a threat to himself, others, or state property. (*Id.* at ¶ 21.) Brill then tackled Plaintiff to the ground and Plaintiff was escorted to the shower in the medical unit by Brill and CO Austin Craig ("Craig"). (*Id.* at ¶¶ 22-23.) While in the shower area and out of camera view, Craig deployed his OC against Plaintiff without issuing an order and while Plaintiff was not posing a threat. (*Id.* at ¶¶ 24-25.)

Craig and Brill uncuffed Plaintiff, had him remove his clothes, and allowed him to take a brief shower. (*Id.* at ¶¶ 26-27.) Plaintiff was redressed in the same clothes he was wearing when sprayed, which resulted in a continuing burning sensation, then Plaintiff was placed by Brill and Craig in a temporary holding cage[2] for the rest of the night. (*Id.* at ¶¶ 28-30.) That morning, Plaintiff was assigned to suicide watch and was shortly thereafter issued a mental health discharge by licensed professional counselor Valerie Hutson, who also did not recommend razor restrictions for Plaintiff. (*Id.* at ¶¶ 31-32.) Plaintiff was placed back into segregation but suffered seizures over the following days and was transferred to two different hospitals and returned to segregation on February 18, 2023. (*Id.* at ¶¶ 33-34.) Upon his return to NCRJ, Plaintiff's cellmates attacked Plaintiff by smashing his electronic tablet on his head. (*Id.* at ¶ 35.) COs arrived and separated Plaintiff from his cellmates, after which Plaintiff explained he was attacked by his cellmates. (*Id.* at ¶ 36.) As alleged, CO Jameson told the other COs that Plaintiff was lying. (*Id.*) CO Graff

---

[2] A temporary holding cage, also known as a bird cage, is a free-standing, barred cage large enough for one individual to sit or stand inside. These cages are placed at regular intervals throughout the various areas of the jail facility, including in hallways. (ECF No. 78 at ¶ 93 n.4.)

issued Plaintiff a write-up for assaulting his cellmates and breaking the tablet on his own head. (*Id.* at ¶ 37.)

Between February 19 and February 27, 2023, Plaintiff was evaluated by mental health clinicians, during which time the clinicians were informed of Plaintiff's previous suicide attempts, ongoing hallucinations, and Plaintiff's past experience of sexual assault. (*Id.* at ¶¶ 38-43.) During this time, Plaintiff was placed on-and-off suicide watch, but no mental health clinician added a razor restriction for Plaintiff. (*Id.*) On February 28, 2023, Plaintiff was released from suicide watch and placed into segregation, and within a week of his release, COs gave Plaintiff a razor upon his request. (*Id.* at ¶ 44.) COs also placed unmonitored boxes of razors by the showers and Plaintiff regularly found razors left behind in shower areas. (*Id.*) Between February 28 and March 4, 2023, Plaintiff submitted grievances about the fight with his cellmates and about COs tackling him and spraying him with OC in early February. (*Id.* at ¶¶ 46-49.) On March 4, 2023, Plaintiff was served a write-up by CO Graff alleging that Plaintiff admitted to CO Graff that Plaintiff had broken the tablet on February 18 by smashing it against his own head. (*Id.* at ¶ 50.) On March 6, 2023, a hearing occurred where Plaintiff was found "guilty" of breaking the tablet on his own head and was issued a $350 fine. (*Id.* at ¶ 51.) Two days later, Plaintiff attempted suicide by swallowing razors blades and was placed on suicide watch upon his return from the hospital. (*Id.* at ¶ 52.)

Plaintiff alleges that upon his return to NCRJ from the hospital on March 9, 2023, Plaintiff asked CO Craig for a "suicide blanket." (*Id.* at ¶ 54.) CO Craig returned with a blanket along with CO Brandon Gier ("Gier"). (*Id.* at ¶ 55.) Craig and Gier removed Plaintiff from the booking cell without handcuffs and walked him to the shower and instructed Plaintiff to step into

an area where there were no security cameras. (*Id.*) Craig and Gier handcuffed Plaintiff, who was wearing a paper suicide shirt and underwear, and Plaintiff complied. (*Id.*) Without further orders, Gier and Craig pushed Plaintiff's head into the wall, pushed him to the ground, and tore off his clothes. (*Id.* at ¶ 56.) Craig strangled Plaintiff with both hands until Plaintiff lost consciousness. (*Id.* at ¶ 57.) Plaintiff woke up to Craig slapping him and asked why "this was being done to him." (*Id.* at ¶¶ 58-59.) As alleged, Craig replied that it was because Plaintiff was a "pain in the ass" who needed to "learn a lesson." (*Id.*) Craig then sprayed Plaintiff with OC directly in the face despite Plaintiff being handcuffed on the floor, not resisting, and posing no threat to person or property. (*Id.* at ¶ 61.) Craig and Gier then sprayed Plaintiff's entire body with OC, including his genitals, "exhausting multiple cans of OC." (*Id.* at ¶ 62.)

Plaintiff was then wrapped in a blanket and walked to a nurse by Craig, who then sent Plaintiff to the shower for decontamination. (*Id.* at ¶ 63.) Plaintiff was escorted back to booking where he remained on a cell floor for the night until he was placed in the suicide watch unit. (*Id.* at ¶¶ 64-65.) Plaintiff requested grievance forms to report Gier and Craig but was not given the requested forms because individuals on suicide watch are not permitted to have any items in their possession. (*Id.* at ¶¶ 66-67.) The following day, Plaintiff told Valerie Hutson that he was sprayed but did not do anything wrong and wished that he could be dead. (*Id.* at ¶ 68.)

On March 22, 2023, Plaintiff was removed from suicide watch and he began filing grievances relating to the fight with his cellmates and the incident involving Gier and Craig. (*Id.* at ¶ 69.) On April 4, 2023, Hearing Officer Gary Sigler issued Plaintiff a write-up from CO Gier alleging that on March 9, the night Gier and Craig beat and sprayed Plaintiff, Plaintiff disobeyed an order and created a disturbance. (*Id.* at ¶ 71.) Plaintiff alleges that Gier and Craig falsified

5

the allegations to "cover up their abuses." (*Id.* at ¶ 72.) Hearing Officer Sigler found Plaintiff guilty of the alleged offense and Plaintiff remained in disciplinary detention until May 16, 2023, when he was transferred to administrative segregation. (*Id.* at ¶¶ 73-74.) In June 2023, after witnessing other inmates get sprayed by COs, Plaintiff filed a third-party grievance. (*Id.* at ¶¶ 75-76.) Several hours later, COs entered Plaintiff's cell and destroyed his property. (*Id.* at ¶¶ 77-82.)

On August 9, 2023, after a change in medication, Plaintiff attempted suicide by cutting himself and swallowing razor blades to "get the demon out." (*Id.* at ¶ 83.) Two days later, COs told Nurse Dustyn Isner that having a one-on-one constant suicide watch was "not a real thing due to staffing." (*Id.* at ¶ 84.) On August 12 and September 11, 2023, health professionals placed razor restrictions on Plaintiff's mental health discharge order. (*Id.* at ¶¶ 85-87.) Despite this, on September 16, 2023, Plaintiff found and swallowed a razor. (*Id.* at ¶ 88.)

On October 2, 2023, Plaintiff was in his cell and speaking to a CO when CO Jesse Smith ("Smith") entered the unit and told Plaintiff to "cuff up." (*Id.* at ¶ 93.) Smith traded insults with Plaintiff while escorting Plaintiff to the temporary holding cages. (*Id.*) Upon arriving at the cages, Smith squeezed and pinched Plaintiff's forearm then slammed Plaintiff against the back of the cage. (*Id.*) While pressed against the wall, Smith punched Plaintiff in the head twice and put Plaintiff in a wrist lock, during which Plaintiff heard his arm "pop." (*Id.* at ¶ 94.) As alleged, Smith said something to the effect of "add that to your lawsuit, bitch. I hope I broke your hand." (*Id.* at ¶ 95.) Because of the write-ups he received at NCRJ, Plaintiff was transferred to the Mt. Olive Correctional Complex in fall 2023 and remains in administrative segregation on the quality-of-life program. (*Id.* at ¶ 100.)

6

Defendants filed their Motion to Dismiss Plaintiff's Amended Complaint pursuant to Federal Rules of Civil Procedure 8 and 12(b)(6) on January 21, 2025. (ECF No. 85.) Plaintiff filed his response on February 4, 2025. (ECF No. 103.) Finally, Defendants filed their reply on February 11, 2025. (ECF No. 105.) As such, this motion is fully brief and ripe for adjudication.

## II. LEGAL STANDARD

A motion to dismiss filed under Rule 12(b)(6) tests the legal sufficiency of a complaint or pleading. *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "When ruling on a motion to dismiss, courts must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *Farnsworth v. Loved Ones in Home Care, LLC*, 2019 WL 956806, at *1 (S.D. W. Va. Feb. 27, 2019) (citing *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)). Thus, "a complaint is to be construed liberally so as to do substantial justice." *Hall v. DIRECTV, LLC*, 846 F.3d 757, 777 (4th Cir. 2017).

To survive a motion to dismiss, the plaintiff's factual allegations, taken as true, must "state a claim to relief that is plausible on its face." *Robertson v. Sea Pines Real Est. Cos.*, 679 F.3d 278, 288 (4th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678). The plausibility standard is not a probability requirement, but "asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). To achieve facial

plausibility, the plaintiff must plead facts allowing the court to draw the reasonable inference that the defendant is liable, moving the claim beyond the realm of mere possibility. *Id.* at 663 (citing *Twombly*, 550 U.S. at 556). Mere "labels and conclusions" or "formulaic recitation[s] of the elements of a cause of action" are insufficient. *Twombly*, 550 U.S. at 555. Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 268 (1986)).

### III. DISCUSSION

#### A. Count V

In Count V, Plaintiff alleges that Defendants Hutson, Wood, and Caudill "violated [Plaintiff's] Fourteenth Amendment rights when they were deliberately indifferent to the serious risk of substantial harm to [Plaintiff's] health and safety posed by the well-known and long-tolerated pattern and practice of correctional officers at NCRJ using excessive force on inmates, including pepper spraying, beating and otherwise using physical violence against inmates like [Plaintiff], for no legitimate, nonpunitive purpose." (ECF No. 78 at ¶ 154.) Plaintiff further alleges that he suffered serious harm because of Defendants' deliberate indifference, including physical injuries resulting from the deployment of OC spray and beatings, and a worsening of Plaintiff's pre-existing mental health conditions. (*Id.* at ¶ 155.)

In response, Defendants argue that Plaintiff's Amended Complaint fails to allege sufficient facts to state a claim upon which relief can be granted for deliberate indifference. (ECF No. 86 at 6.) Namely, Defendants argue that Plaintiff "fails to allege facts that could plausibly show that these Defendants had actual or constructive knowledge that the officer Defendants were engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to inmates such

as the Plaintiff." (*Id.* at 10.) Defendants argue that Plaintiff's allegations are conclusory and do "not plausibly support the conclusion that these Defendants, prior to February 2, 2023, had actual or constructive knowledge that uses of force at NCRJ were excessive or unconstitutional." (*Id.* at 11.) Defendants further argue that there was no "affirmative causal link between the supervisor's inaction and the particular constitutional injury allegedly suffered by Plaintiff." (*Id.*) Finally, Defendants raise a qualified immunity defense.

A pretrial detainee's claim based upon deliberate indifference to a substantial risk of serious harm is properly brought under the Fourteenth Amendment. *Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023). To state a claim for deliberate indifference to a substantial risk of serious harm, a plaintiff must sufficiently allege that: (1) the plaintiff was exposed to a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to address the risk posed; (3) the defendant knew or should have known of the risk and that that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the plaintiff was harmed. *Hartman*, 87 F.4th at 611; *see Stevens v. Holler*, 68 F.4th 921, 931 (4th Cir. 2023).

The plaintiff no longer must show that the defendant had actual knowledge of the condition causing a substantial risk of serious harm. *Hartman*, 87 F.4th at 611. "Now, it is sufficient that the plaintiff show that the defendant's action or inaction was, in *Kingsley*'s words, 'objectively unreasonable' . . . that is, the plaintiff must show that the defendant should have known of that condition and that risk, and acted accordingly." *Id.* (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). This standard is equivalent to civil recklessness where the plaintiff must show that the defendant acted or failed to act "in the face of an unjustifiably high risk of harm that is

9

either known or so obvious that it should be known." *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). "[I]t is still not enough for the plaintiff to allege that the defendant negligently or accidentally failed to do right by the detainee." *Hartman*, 87 F.4th at 611-12.

"The deliberate indifference standard generally applies to cases alleging failures to safeguard the inmate's health and safety, including failing to protect inmates from attack, maintaining inhumane conditions of confinement, or failing to render medical assistance." *Thompson v. Commonwealth*, 878 F.3d 89, 97 (4th Cir. 2017). Deliberate indifference claims can also apply to supervisors of jails and prisons. *See Estate of Davis by Ostenfeld v. Delo*, 115 F.3d 1388, 1396 (8th Cir. 1997). A claim that a supervisor is deliberately indifferent to a substantial risk of serious harm is different from a claim brought under a theory of supervisory liability. Supervisory liability is a theory of liability to hold supervisory officials responsible for the "constitutional injuries inflicted by their subordinates." *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994.)

Before examining the sufficiency of Plaintiff's pleadings, it should be noted that Defendants confuse supervisory liability with deliberate indifference. Defendants argue that the "claims are clearly based on supervisory liability, regardless of semantics." (ECF No. 105 at 7.) This is incorrect, as Plaintiff is not alleging that Defendants are responsible for the actions of their subordinates, but rather that the Defendants themselves were deliberately indifferent to a substantial risk of serious harm. (ECF No. 78 at ¶ 154.) One element of such an allegation requires the plaintiff to plead that a defendant "intentionally, knowingly, or recklessly acted or failed to act to address the risk posed." *Hartman*, 87 F.4th at 611. Furthermore, "[a] state official can be liable in a § 1983 suit in three ways: in his personal capacity, his official capacity, or in a

more limited way, his supervisory capacity." *King v. Rubenstein*, 825 F.3d 206, 223 (4th Cir. 2016). This is not a claim based on Defendants' supervisory capacity or the actions or inactions of a subordinate, but rather, a claim based on the actions or inactions of the Defendants, who just happen to be supervisors. *See Ostenfeld v. Delo*, 115 F.3d 1388, 1396 (8th Cir. 1997) (upholding a finding that a prison superintendent was deliberately indifferent to a substantial risk of serious harm when he had notice of an officer's prior excessive force and failed to take appropriate action).

### 1. *Substantial Risk of Serious Harm*

To state a claim for deliberate indifference to a substantial risk of serious harm, the first factor requires a plaintiff to sufficiently plead that he was exposed to a substantial risk of serious harm. *Hartman*, 87 F.4th at 611. The alleged risk is analyzed using an objective standard. *Carmona v. Martin*, 2024 WL 4490695 at *2 (4th Cir. Oct. 15, 2024). Beatings by COs have been found to be the type of "serious harm" contemplated in this factor. *See Younger v. Crowder*, 79 F.4th 373, 381-83 (4th Cir. 2023) (holding that a reasonable jury could conclude that a substantial risk of serious harm would occur due to a pattern of assaults and retaliations by COs); *see Slakan v. Porter*, 737 F.2d 368 (4th Cir. 1984) (holding that a prison warden is deliberately indifferent for failing to act despite knowing that COs would retaliate against inmates by beating them and spraying them with a fire hose).

In his Amended Complaint, Plaintiff makes numerous allegations that an objective substantial risk of serious harm to Plaintiff existed at the facility through a pattern and practice of violence against inmates. (ECF No. 78 at ¶¶ 106-12.) However, many of these allegations are legal conclusions and do not provide sufficient supporting facts. While a complaint does not need to contain detailed factual allegations, the law "demands more than an unadorned, the-defendant-

unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678. For example, Plaintiff alleges that "[t]here is a general pattern and practice among many correctional officers at NCRJ to use pepper spray and other modes of physical force in excess of any legitimate nonpunitive governmental purpose" and "Correctional Officers at NCRJ make a practice of taking individuals into showers . . . where there are no cameras and using pepper spray against them or otherwise physically assaulting them in a manner that is not rationally related to any legitimate nonpunitive governmental purpose." (ECF No. 78 at ¶¶ 106-07.) These are simply legal conclusions without any factual backing. Furthermore, Plaintiff alleges throughout the Amended Complaint that there are numerous use of force reports. However, use of force reports, without more, do not mean that such uses of force were excessive.

Despite the many conclusory allegations, Plaintiff still makes a sufficient pleading as to the first factor. For example, Plaintiff alleges that, based on Defendants' reviews of use of force reports, there were "conspicuous instances of spraying in the absence of any legitimate nonpunitive governmental objective." (*Id.* at ¶ 113.) Rather than just alleging in a conclusory manner that there were instances of spraying in the absence of any legitimate nonpunitive governmental objective, the allegation is based on use of force reports, which is a supporting fact. Further, Plaintiff alleges that "Wood and Hutson each knew, or should have known, from general discussion at NCRJ among staff and employees that CO Defendants regularly took handcuffed or otherwise immobilized inmates into the shower area and other areas without security camera coverage to assault them, including spraying them with oleoresin capsicum." (*Id.* at ¶ 126.) These claims of "regular[]" physical assaults are not conclusory because the information is derived from "general discussion at NCRJ among staff and employees," which is also a supporting fact.

12

In accepting these allegations as true, drawing "all reasonable inferences in favor of the plaintiff," and construing the "complaint liberally as to do substantial justice," Plaintiff sufficiently alleges that a substantial risk of serious harm existed to Plaintiff, satisfying the pleading for the first element. *Kolon Indus., Inc.*, 637 F.3d at 440; *DIRECTV, LLC*, 846 F.3d at 777.

    2. *Intentional, Knowing, or Reckless Actions*

Second, deliberate indifference to a substantial risk of serious harm requires that the defendant intentionally, knowingly, or recklessly acted or failed to act to address the risk posed. *Hartman*, 87 F.4th at 611. It is "not enough for the plaintiff to allege that the defendant negligently or accidentally failed to do right by the detainee." *Id.* at 611-12. Plaintiff alleges that Defendants Wood and Hutson "did nothing to stop or investigate these practices, nor to terminate, discipline, or otherwise take adverse employment action against correctional officers who engaged in these practices, including CO Defendants" and that Defendant Caudill "did nothing to stop or to investigate these practices, nor to recommend termination, discipline or other adverse employment action against CO Defendants." (ECF No. 78 at ¶¶ 128, 130.)

Because Plaintiff is alleging inaction on the part of Defendants, there are little-to-no facts that Plaintiff can provide other than the resultant harm of the alleged inaction. Here, Plaintiff alleges that the inaction led to assaults by the Defendant COs which resulted in injuries such as gagging, difficulty breathing, coughing, and a painful burning sensation as a result of the OC spray, and physical pain from beatings, including a "persistent knee injury following Defendant Gier's and Craig's assault and pain in his arm due to Officer Smith's beating, which required a medical visit." (*Id.* at ¶¶ 97, 99). Plaintiff also alleges that as a result of Defendants' actions, Plaintiff experienced "mental and emotional distress, including a fear for his life, exacerbated symptoms of

13

PTSD related to his previous assaults at correctional facilities, humiliation, embarrassment, anxiety and stress." (*Id.* at 98.) Combining the alleged substantial risk of serious harm with the severity of Plaintiff's resultant injuries, the Court can draw a reasonable inference that the alleged inaction was intentional, knowing, or reckless. Therefore, Plaintiff has sufficiently met the second factor of the claim.

### 3. *Knowledge of the Risk of Harm*

The third factor requires that the defendant knew or should have known of the risk of harm and that the defendant's action or inaction posed an unjustifiably high risk of harm. *Hartman*, 87 F.4th at 611. Plaintiffs do not have to show that the defendant had actual knowledge of the risk, "it is sufficient that the plaintiff show that the defendant's action or inaction was . . . 'objectively unreasonable.'" *Id.* (citing *Kingsley*, 576 U.S. at 397). "[T]hat is, the plaintiff must show that the defendant should have known of that condition and that risk, and acted accordingly." *Id.* Plaintiff alleges that, upon information and belief, "Wood and Hutson saw inmate grievances, requests and other communications accusing the various CO Defendants of physically striking the grievants as well as using pepper spray against them and other inmates without provocation." (ECF No. 78 at ¶ 125.) Plaintiff also alleges that "Wood and Hutson each knew, or should have known, from general discussion at NCRJ among staff and employees that CO Defendants regularly took handcuffed or otherwise immobilized inmates into the shower area and other areas without security camera coverage to assault them, including spraying them with oleoresin capsicum." (*Id.* at ¶ 126.) As previously discussed, these are not conclusory because they are based on supporting facts. Relevant to this factor, Plaintiff alleges that Defendants Wood and Hutson knew or should have known of the risks posed to Plaintiff based on "inmate grievances, requests and other

14

communications" as well as "from general discussion at NCRJ among staff and employees." Therefore, Plaintiff sufficiently alleges that Hutson and Wood knew or should have known of the risk and harm posed by their alleged inaction.

However, Plaintiff's allegations fall short as to Defendant Caudill on this factor. Plaintiff alleges that Caudill "saw use of force reports by these officers at a rate demanding investigation and involving conduct that demanded investigation. Upon information and belief, Defendant Caudill saw use of force reports that were plainly inaccurate and thus demanded an investigation on that basis. Upon information and belief, Defendant Caudill knows or should know of the practice of CO Defendants taking inmates into areas without security-camera coverage to beat them or use oleoresin capsicum spray against them." (*Id.* at ¶ 129.) First, merely seeing a high number of use of force reports does not mean that the uses of force were excessive. Second, just because a use of force report is inaccurate does not mean that the force used in those instances were also excessive. Plaintiff also does not provide support as to how the reports were inaccurate. Finally, Plaintiff's claim that Caudill knows or should know of the practice by COs of taking inmates into the showers to beat or spray them is not supported by any fact. Therefore, Plaintiff did not sufficiently allege that Defendant Caudill knew or should have known of the risk of harm to Plaintiff and that that his inaction posed an unjustifiably high risk of harm.

### 4. *Harm to the Plaintiff*

The final factor requires that, as a result of a defendant's deliberate indifference, the plaintiff was harmed. *Hartman*, 87 F.4th at 611. Plaintiff alleges that he "suffered serious harm because of Defendants' deliberate indifference. [Plaintiff] suffered injuries from the use of excessive force against him, including a painful burning sensation on his skin, difficulty breathing,

and pain to his eyes due to the deployment of pepper spray against him. He also suffered physical pain from the beating from Defendants Gier and Craig. These physical injuries also caused a worsening of his pre-existing mental health conditions." (*Id.* at ¶ 155.) This is a sufficient pleading because Plaintiff articulated the harm in a specific manner, including by indicating when and how the injuries happened to him.

    5. *Qualified Immunity*

Finally, Defendants raise qualified immunity as a defense. Qualified immunity shields government officials performing discretionary functions from civil liability when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The test for qualified immunity is "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) if so, whether that right was clearly established at the time of the defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223 (2009). "Protections for pretrial detainees under the Fourteenth Amendment are 'at least as great as the Eighth Amendment protections available to a convicted prisoner.'" *Hartman*, 87 F.4th at 607 (citing *City of Revere v. Mass. Gen. Hospital*, 463 U.S. 239, 244 (1983)).

By February 2023, it was clearly established that the use of excessive force against restrained or subdued detainees, including through OC spray, is a constitutional violation. *See Dean v. Jones*, 984 F.3d 295, 304-05 (4th Cir. 2021). Further, by February 2023, it was clearly established that a supervisory prison official "violates an inmate's Fourteenth Amendment rights when he knows—based on officers' past behavior and warnings about officers' excessive use of force—that his officers are likely to attack and seriously injure the inmate in retaliation for the

16

inmate's behavior." *Younger*, 79 F.4th at 386; *see Slakan*, 737 F.2d at 373-76 (denying a warden qualified immunity when he was deliberately indifferent to his officers retaliating against inmates by beating them and spraying them with a fire hose). Defendants Hutson and Wood are not entitled to qualified immunity. Therefore, as it applies to a pattern of excessive force by COs, Plaintiff has made a sufficient pleading for deliberate indifference to a substantial risk of serious harm as to Defendants Wood and Hutson, but not as to Defendant Caudill. On Count V, Defendants' motion to dismiss is **GRANTED** as to Defendant Caudill but **DENIED** as to Defendants Wood and Hutson.

### B. Count VI

In Count VI, Plaintiff alleges that Defendants Hutson and Wood knew of or should have known of the substantial risk of serious harm to Plaintiff posed by failing to restrict razor access to inmates prone to self-harm. (ECF No. 78 at ¶ 160.) Plaintiff also alleges that Hutson and Wood "knew or should have known of Plaintiff's tendency to attempt suicide by swallowing razors and cutting himself with razors," and alleges that they "did not take measures to ensure that razors were properly distributed (or not) to inmates like [Plaintiff], did not adequately train COs to distribute razors safely and collect razors from the shower area or to verify that inmates were not hoarding razors, or to discipline COs who failed to follow safe-razor-distribution procedures." (*Id.* at ¶¶ 163-64.) Finally, Plaintiff alleges that this deliberate indifference resulted in injuries from Plaintiff's suicide attempts, including "scarring in his throat, gastric problems, and worsening of his pre-existing mental health conditions." (*Id.* at ¶ 165.) Defendants again argue that Plaintiff failed to allege sufficient facts to state a claim upon which relief can be granted for deliberate indifference. (ECF No. 86 at 13.)

17

*1. Substantial Risk of Serious Harm*

The first factor requires plaintiff to be exposed to a substantial risk of serious harm. As alleged, Plaintiff suffers from major depression, post-traumatic stress disorder, schizoaffective disorder, borderline personality disorder, antisocial personality disorder, frequent suicidal ideation, and requires psychiatric medications to quell hallucinations and suicidal ideation. (ECF No. 78 at ¶ 15.) Plaintiff has previously attempted suicide by cutting himself and swallowing razors at WVDCR facilities prior to his incarceration at NCRJ. (*Id.* at ¶ 16.) On various instances, Plaintiff informed mental health clinicians of his suicide attempts and desires, and told clinicians not to give him razors. (*Id.* at ¶¶ 40-41.) Mental health clinicians failed on various occasions to place razor restrictions on Plaintiff. (*See id.* at ¶¶ 32, 38, 41.) When Plaintiff did get access to razors, he attempted suicide by cutting himself or swallowing them on three separate occasions. (*Id.* at ¶¶ 52, 83, 88.) Based on these allegations, plaintiff sufficiently pleaded that a substantial risk of serious harm existed by exposing Plaintiff to razors.

*2. Intentional, Knowing, or Reckless Actions*

The second factor requires that the defendant intentionally, knowingly, or recklessly acted or failed to act to address the risk posed. In a conclusory fashion, Plaintiff alleges that Defendants Wood and Hutson "were responsible for ensuring that razor restrictions on mental health orders were followed by Correctional Officers." (*Id.* at ¶ 133.) However, elsewhere in the Amended Complaint, Plaintiff alleged that mental health clinicians failed to recommend razor restrictions for Plaintiff. (*Id.* at ¶¶ 32, 38, 41.) In the one instance where Plaintiff was on a razor restriction and swallowed a razor, it was only alleged that Plaintiff "found" the razor, not that any intentional, knowing, or reckless act or inaction by Defendants or COs resulted in Plaintiff obtaining the razor.

18

(*Id.* at ¶ 88.) At most, Plaintiff alleges negligence on behalf of the COs and mental health clinicians when it came to placing razor restrictions or handling razors – this is not enough to plead deliberate indifference on factor two as to Defendants Hutson and Wood.

### 3. Knowledge of the Risk of Harm

The third factor requires that the defendant knew or should have known of the risk of harm and that that the defendant's action or inaction posed an unjustifiably high risk of harm. Here, Plaintiff alleges, again in conclusory fashion, that Defendants Hutson and Wood "knew or should have known of [Plaintiff's] tendency to attempt suicide by swallowing razors and cutting himself with razors." (*Id.* at ¶ 163.) However, Plaintiff offers no facts to back the allegation. Further, Plaintiff did not allege that there was a systemic problem of razors not being properly distributed or collected to where Defendants should have known about the problem before the alleged incidents. There is also no allegation that Defendants' inaction posed an unjustifiably high risk of harm, particularly considering Plaintiff's frequent mental health visits and the failures of the mental health clinicians to place proper razor restrictions. Therefore, Plaintiff's Amended Complaint is insufficient as to factor three.

### 4. Harm to the Plaintiff

Finally, the fourth factor requires that, as a result of a defendant's deliberate indifference, the plaintiff was harmed. While Plaintiff was certainly harmed by his access to razors, which included three suicide attempts requiring surgery, Defendants Hutson and Wood were not deliberately indifferent to a substantial risk of serious harm to Plaintiff posed by failing to restrict his access to razors because Plaintiff did not plead sufficient facts as to factors two and three. Therefore, Defendants' motion to dismiss Count VI is **GRANTED**.

19

## IV. CONCLUSION

For the above-mentioned reasons, Defendants' motion to dismiss on Count V is **GRANTED** as to Defendant Caudill but **DENIED** as to Defendants Hutson and Wood. Furthermore, Defendants' motion to dismiss on Count VI is **GRANTED**.

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

ENTER:   May 14, 2025

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE